Matthew G. Monforton  (Montana Bar # 5245)
Monforton Law Offices, PLLC
32 Kelly Court
Bozeman, Montana 59718
Telephone:  (406) 570-2949
matthewmonforton@yahoo.com

Quentin M. Rhoades
Rhoades, Siefert & Erickson, PLLC
430 Ryman Street
Missoula, MT 59802
(406) 721-9700
qmr@montanalawyer.com

Attorneys for Plaintiff Montana Citizens For Right to Work

## UNITED STATES DISTRICT COURT
## DISTRICT OF MONTANA
## HELENA DIVISION

| | |
|---|---|
| MONTANA CITIZENS FOR RIGHT TO WORK, a Montana incidental political committee,<br><br>Plaintiff,<br>v.<br><br>JEFFREY MANGAN, in his official capacity as Montana Commissioner of Political Practices,<br><br>Defendant. | Case No. CV-21-68-H-DWM<br><br>**BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

## <u>INTRODUCTION</u>

The "Fair Notice" provision of Montana's "Clean Campaign Act" (Mont.

Code Ann. § 13-35-402) requires political committees to provide a candidate with

a copy of any mailer published within ten (10) days of an election day if that mailer refers to the candidate. The copy must be transmitted to the candidate by facsimile, email, or hand delivery on the date that the mailer is postmarked. Thus, because the Post Office does not deliver mail until after a postmark date, the Clean Campaign Act forces political committees to provide advance copies of voter mailers to candidates before voters themselves receive them.

The Act applies to mailers that *criticize* candidates but does not apply to mailers that *endorse* candidates. The Act also exempts preferred speakers, such as the press, unions that send campaign mailers to union members, and corporations that send mailers to stockholders or employees. Thus, the Act requires some speakers (but not others) to give some candidates (but not others) advance copies of campaign mailers – depending upon the viewpoint expressed in the mailer.

This bizarre law violates both the First Amendment and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. No other state has a similar law on its books.

Plaintiff Montana Citizens For Right to Work (hereinafter, "Montana Citizens") sent mailers to voters on October 28, 2020 – six days before Election Day on November 3, 2020. Montana Citizens did not provide advance notice of the mailers to the candidates referenced in them.

Defendant Jeff Mangan, Montana's Commissioner of Political Practices, is preparing to prosecute Montana Citizens for violating the Act. The Act, however, is patently unconstitutional. Thus the Court should declare the Act unconstitutional and enjoin its enforcement against Montana Citizens.

**STATEMENT OF FACTS**

Montana Citizens registered as an incidental political committee with the Commissioner on or about May 22, 2020. ECF No. 1 (Verified Complaint), ¶20. Randal Pope has at all times pertinent to this action served as Treasurer and Executive Director for Montana Citizens. *Id*., ¶ 21.

On October 28, 2020, Montana Citizens brought to the U.S. Post Office approximately 16,000 campaign mailers addressed to voters residing in 20 different Montana legislative districts. *Id*., ¶ 22. Each mailer contained three documents: (1) a "2020 Candidate Survey" that included responses from legislative candidates concerning their opinions on the right to work, (2) a "Dear Friend" letter, and (3) a "Right To Work Survey Reply Memo." *Id*., ¶ 23.

Montana Citizens tailored the documents based upon right-to-work opinions expressed by candidates running in the legislative districts to which the mailers were addressed. *Id*., ¶ 24. Thus, for example, the documents contained in mailers addressed to voters in Montana Senate District 26 in Billings referenced right-to-work opinions expressed by Democrat Margie MacDonald and Republican Chris

Friedel, the candidates who ran in SD 26 in 2020. *Id.*, ¶ 25. The documents were identical in all respects aside from the names of the candidates referenced and the candidates' opinions concerning right to work. *Id.*, ¶ 26. Copies of the documents are included in the Commissioner's "Finding of Sufficient Facts To Support A Campaign Practice Act Violation." *Id.*, ¶ 27; see also ECF No. 1-2 at 17-79.[1] Montana Citizens timely filed a campaign-finance report with the Commissioner's office identifying the mailers, ECF No. 1-2 at 80, but did not provide copies of the mailers to the candidates referenced in those mailers. *Id.*, ¶ 28.

On October 30, 2020, Trent Bolger filed a complaint with the Commissioner alleging that Montana Citizens failed to give candidates "fair notice" of the mailers as required by the Act. *Id.*, ¶ 29. A copy of the complaint can be found at ECF No. 1-1. Bolger signed the complaint in his capacity as a senior advisor for the Montana Democratic Party. ECF No. 1-1 at 3.

Jeff Mangan, Montana's Commissioner of Political Practices, requested additional documentation from Montana Citizens in response to the complaint. *Id.*, ¶ 32. Montana Citizens complied by providing him with copies of the documents contained in the mailers. *Id.*, ¶ 33; ECF 1-2 at 16.

---

[1] Citations to page numbers refer to those assigned by the Court's electronic court filing system.

On March 10, 2021, the Commissioner issued a "Finding of Sufficient Facts To Support A Campaign Practice Act Violation." ECF No. 1-2. The Finding included the following assertion:

> Sufficiency Finding No. 1: There are sufficient facts to show [Montana Citizens] failed to provide candidates notice under Montana's Clean Campaign Act [Mont. Code Ann. § 13-35-402] on October 28, 2020 of an electioneering communications delivered within 10 days of the 2020 November 2 general election.

ECF No. 1-2 at 11. He concluded that "a civil fine is justified" and issued a " 'sufficient evidence' Finding and Decision justifying a civil fine or civil prosecution…." ECF No. 1-2 at 13. He noted that "should the County Attorney waive the right to prosecute...this Matter returns to this Commissioner for possible prosecution." ECF No. 1-2 at 14. Further, "in the event that a fine is not negotiated and the Matter is resolved, the Commissioner retains statutory authority to bring a complaint in [state] district court against any person who intentionally or negligently violates any requirement of campaign practice law, including those of Mont. Code Ann. § 13-35-402." ECF No. 1-2 at 14.

In a letter dated August 18, 2021, the Commissioner informed Montana Citizens that the matter had returned to him. *Id.*, ¶ 39; ECF No. 1-3. He is demanding $8,000 or else "[t]he Commissioner could pursue action in [state] district court for a minimum of $20,000.00 for violations of Montana's Campaign Finance and Practices laws." *Id.*, ¶ 39; ECF No. 1-3.

**ARGUMENT**

A party may move for summary judgment at any time on all claims or defenses or a part of a claim or defense. Fed. R. Civ. P. 56(a) & (b). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

As explained below, Montana's so-called "Clean Campaign" Act violates both the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. Montana Citizens is thus entitled to summary judgment in its favor.

## I. THE "CLEAN CAMPAIGN" ACT VIOLATES THE FIRST AMENDMENT

### A. **The Act is a Content-Based Restriction on Protected Speech**

Montana Citizens' speech pertains to the rights of workers to be free of forced unionization and is entitled to the greatest degree of constitutional protection. *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982) ("expression on public issues has always rested on the highest rung of the hierarchy of First Amendment values."); *Roe v. City of San Diego*, 356 F.3d 1108 (9th Cir. 2004) (speech involving public policy "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection").

6

Restrictions on protected speech that are based upon content are subject to strict scrutiny. *Tschida* v. *Motl*, 924 F.3d 1297, 1303 (9th Cir. 2019). Such restrictions cannot survive strict scrutiny unless they achieve a compelling state interest and the statute is narrowly tailored. *Id*. A law is content-based if it (1) applies to particular speech because of the topic discussed or the idea or message expressed, (2) requires authorities to examine the contents of the message to see if a violation has occurred, or (3) is justified by a concern that stems from the direct communicative impact of the speech. *Id*.

Even more problematic than content-based laws are ones that discriminate based upon viewpoint – such laws are "an egregious form of content discrimination." *Rosenberger v. Rector & Visitors of Univ. Virginia*, 515 U.S. 819, 829 (1995). When "the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Id*. Viewpoint discriminatory laws are therefore "presumptively unconstitutional," *id.* at 830, and are "a form of speech suppression so potent that it must be subject to rigorous constitutional scrutiny." *Matal v. Tam*, 137 S. Ct. 1744, 1765 (2017) (Kennedy, J., concurring). Accordingly, "the Court's precedents have recognized just one narrow situation in which viewpoint discrimination is permissible: where the government itself is speaking or recruiting others to communicate a message on its behalf." *Id.* at 1768.

Viewpoint discrimination arises from, *inter alia*, statutes that burden criticisms while leaving laudatory speech unmolested. For example, the Supreme Court in *Matel* invalidated a statute prohibiting trademarks which "disparage" persons but allowing positive or benign trademarks. The statute "thus reflects the Government's disapproval of a subset of messages it finds offensive. This is the essence of viewpoint discrimination." *Matel*, 137 S. Ct. at 1766 (Kennedy, J., concurring). The Ninth Circuit and other courts have invalidated similar laws. See, *e.g.*, *American Freedom Defense Initiative v. King County*, 904 F.3d 1126, 1130-31 (9th Cir. 2018) (public transit agency's ban on any ad that "demeans or disparages" individuals was viewpoint discriminatory); *Davison v. Loudoun County Board of Supervisors*, 267 F. Supp. 3d 702, 717 (E.D. Va. 2017) ("the suppression of critical commentary regarding elected officials is the quintessential form of viewpoint discrimination"); *Leventhal v. Vista Unified School Dist.*, 973 F. Supp. 2d 951, 960 (S.D. Cal. 1997) (school district rule prohibiting criticism of employees during board meetings "allows expression of two points of view (laudatory and neutral) while prohibiting a different point of view (negatively critical) on a particular subject matter" and was thus "a classic form of viewpoint discrimination").

The Clean Campaign Act is clearly a content-based speech regulation under any of the tests outlined by the Ninth Circuit.[2] *Tschida*, 924 F.3d at 1303. The

---

[2] Section 13-35-402 states as follows:

**Fair notice period before election.** (1) A candidate or a political committee shall at the time specified in subsection (3) provide to candidates listed in subsection (2) any final copy of campaign advertising in print media, in printed material, or by broadcast media that is intended for public distribution in the 10 days prior to an election day unless:

(a) identical material was already published or broadcast; or

(b) the material does not identify or mention the opposing candidate.

(2) The material must be provided to all other candidates who have filed for the same office and who are individually identified or mentioned in the advertising, except candidates mentioned in the context of endorsements.

(3) Final copies of material described in subsection (1) must be provided to the candidates listed in subsection (2) at the following times:

(a) at the time the material is published or broadcast or disseminated to the public;

(b) if the material is disseminated by direct mail, on the date of the postmark; or

(c) if the material is prepared and disseminated by hand, on the day the material is first being made available to the general public.

(4) The copy of the material that must be provided to the candidates listed in subsection (2) must be provided by electronic mail, facsimile transmission, or hand delivery, with a copy provided by direct mail if the recipient does not have available either electronic mail or facsimile transmission. If the material is for broadcast media, the copy provided must be a written transcript of the broadcast.

Act applies to speech based upon the topic discussed: speech involving candidates for public office. Moreover, the Act requires the Commissioner to examine the contents of campaign materials to determine if they constitute endorsements of candidates. Materials that do not contain candidate endorsements are subject to the Act – those that do contain candidate endorsements are exempt. Mont. Code Ann. § 13-35-402(2). Finally, the Act arises from a concern about the direct communicative impact of the speech – specifically the impact of advertisements involving candidates.

Not only is the Act content-based, it also discriminates based upon viewpoint. Campaign materials consisting of candidate endorsements are not subject to regulation under the Act. Mont. Code Ann. § 13-35-402(2). Campaign materials lacking such endorsements, however, are subject to the Act's regulations. The Act "allows expression of two points of view (laudatory and neutral) while prohibiting a different point of view (negatively critical) on a particular subject matter" and is therefore "a classic form of viewpoint discrimination." *Leventhal*, 973 F. Supp. 2d at 960. The Act therefore results in "an egregious form of content discrimination," *Rosenberger*, 515 U.S. at 829, and "must be subject to rigorous constitutional scrutiny." *Matal,* 137 S. Ct. at 1765.

**B.  The Act Does Not Achieve Any Compelling State Interest**

Because the Clean Campaign Act is subject to strict scrutiny, it cannot survive unless the State demonstrates that the Act is narrowly tailored to achieve a compelling state interest.  *Tschida*, 924 F.3d at 1303; *Sanders County Republican Central Comm. v. Bullock*, 698 F.3d 741, 746 (9th Cir. 2012) (a facially content-based statute may be enforced "only where it is necessary to serve the asserted compelling interest").  Compelling interests are "interests of the highest order." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993).  Articulating an interest of the highest order is particularly important when the state seeks to restrict core First Amendment speech, such as criticism of candidates and politicians.  *Boos v. Barry*, 485 U.S. 312, 322 (1988) ("the First Amendment requires that politicians tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment."); *Lind v. Grimmer*, 30 F.3d 1115, 1120 (9th Cir. 1994) (candidates "must be prepared to endure a heightened level of criticism – including charges of campaign spending improprieties – precisely in order to promote First Amendment values.").

Along with being able to articulate a compelling interest – *i.e.*, an "interest of the highest order," *City of Hialeah*, 508 U.S. at 546 – the State must also provide evidence supporting its alleged need to restrict speech.  *Nixon v. Shrink*

11

*Missouri Government PAC*, 528 U.S. 377, 392 (2000) ("We have never accepted mere conjecture as adequate to carry a First Amendment burden").

The Act does not identify what interest the State has in forcing a political committee to give a candidate notice of a committee's campaign mailers – or why that interest is advanced by a law that discriminates on the basis of viewpoint. Section 13-35-402 begins with the phrase "Fair notice period before election." Presumably, the State believes that a candidate is entitled to "fair notice" of campaign advertising published late in a campaign that references a candidate.

The State has no evidence showing that "fair notice" to candidates of campaign mailers distributed in the last ten days of a campaign somehow amounts to an "interest of the highest order." *City of Hialeah*, 508 U.S. at 546. That none of the other 49 states have enacted such a bizarre restriction is additional evidence that the Act fails to achieve any compelling state interest. This failure alone renders the Act constitutionally invalid.

C.      **The Act is Not Narrowly Tailored Because It is Severely Underinclusive**

A speech restriction that is severely underinclusiveness violates the First Amendment. *Tschida*, 924 F.3d at 1305 (citations omitted). Underinclusiveness "diminishes the credibility of the government's rationale for restricting speech." *Republican Party of Minnesota v. White*, 536 U.S. 765, 780 (2002), quoting *City of*

*Ladue v. Gilleo,* 512 U.S. 43, 52 (1994).  As explained by the Supreme Court:

> While surprising at first glance, the notion that a regulation of speech may be impermissibly underinclusive is firmly grounded in basic First Amendment principles. Thus, an exemption from an otherwise permissible regulation of speech may represent a governmental attempt to give one side of a debatable public question an advantage in expressing its views to the people. Alternatively, through the combined operation of a general speech restriction and its exemptions, the government might seek to select the permissible subjects for public debate and thereby to control the search for political truth.

*City of Ladue,* 512 U.S. at 51.

The Act imposes speech restrictions to provide "fair notice" to a candidate of "campaign advertising in print media, in printed material, or by broadcast media," that references the candidate and is published or broadcast by an opposing candidate or political committee in the last ten days of a campaign.  Mont. Code Ann. § 13-35-402(1).  The Act is riddled with exceptions that render it hopelessly underinclusive.

One of the most obvious exceptions is the Act's inapplicability to oral communications.  Thus, for example, a candidate or members of a political committee can hold telephone conferences or give stem-winders to audiences large and small about an opposing candidate without having to give any notice to the candidate.

The Act has another gaping hole – while it applies to campaign advertising communicated through print or broadcast media, it does not apply to the internet.[3] Thus, a political committee planning to publish a campaign advertisement a week before an election that criticizes a candidate has to give notice to the candidate if it runs the ad in a newspaper, but not if it runs the same ad on Facebook or some other social media platform.

The Act has yet another gaping hole: persons who are not candidates or political committees are not subject to the Act, thereby leaving numerous speakers free to criticize candidates during the last ten days of a campaign without having to provide "fair notice."  For example, non-candidates who mail campaign advertising or purchase newspaper advertisements are not affected by the Act.

Another example is the press itself.  Newspapers, magazines, and broadcast media are not subject to the Act.  This is so even though their editorial boards can (and often do) publish negative editorials about candidates in the last ten days of

---

[3] Though the Act does not define "broadcast media," both the courts and the Montana Legislature have made clear that the term does not include the internet. See, *e.g., Reno v. ACLU,* 521 U.S. 844, 868-69 (1997) (explaining why the "special justifications for regulation of the broadcast media" do not apply to the internet); Mont. Code Ann. § 1-5-625(4)(a) (distinguishing between "broadcast media" and "internet").  The Commissioner himself excludes the internet from his definition of "broadcast media."  He defines "broadcast media" to include "television, radio, cable, satellite, and other similar media" and defines "digital media" to include "content on the internet, electronic files, including digital versions of print media and broadcast media, and other similar media."  Mont. Adm. R. 44.11.103(27)(b) & (c).

the campaign.  Their columnists do as well – as do citizens and groups that submit letters to the editor.  None of these require notice to candidates.

Unions and corporations that are not registered as political parties are also exempt from the Act.  Moreover, campaign materials they distribute to members, stockholders, or employees are exempt from the reporting requirements of Montana campaign-finance law.  Mont. Code Ann. § 13-1-101(18)(b)(iv).  Thus, unions can distribute to their members campaign materials critical of candidates who oppose forced unionization without giving notice to those candidates.  Likewise, corporations can distribute to their employees and shareholder campaign materials critical of candidates who support forced unionization without giving notice to those candidates.

Even if the State could articulate a compelling interest in this case (which it cannot), the Act's numerous holes leave it looking like Swiss cheese.  This severe underinclusiveness "diminishes the credibility of the government's rationale for restricting speech," *White*, 536 U.S. at 780, and renders it unconstitutional.

II.    THE ACT VIOLATES THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT

Under the Equal Protection Clause of the Fourteenth Amendment, no state shall "deny to any person within its jurisdiction the equal protection of the laws." An equal protection claim requires a plaintiff to "show that a class that is similarly

situated has been treated disparately." *Roy* v. *Barr,* 960 F.3d 1175, 1181 (9th Cir. 2020). In reviewing equal protection claims, courts first "identify the government's classification of groups in the statute." *Id.* After identifying a "classified group," courts search for "a comparative group composed of individuals who are similarly situated to those in the classified group in respects that are relevant to the government's challenged policy." *Id.*

If the two groups are similarly situated, courts then apply the appropriate level of scrutiny. Government classifications that are "based on race or national origin, as well as classifications affecting fundamental rights, are given the most exacting scrutiny." *Clark* v. *Jeter,* 486 U.S. 456, 461 (1988); *ACLU of Nevada* v. *City of Las Vegas,* 466 F.3d 784, 799 (9th Cir. 2006). Fundamental rights include the right to discuss candidates. *Eu* v. *San Francisco County Democratic Cent. Comm.,* 489 U.S. 214, 223 (1989) ("the First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office"). Exacting scrutiny requires the law at issue to be "finely tailored to serve the substantial interests of the [State]." *ACLU,* 466 F.3d at 799.

The Act classifies speakers who publish campaign materials about candidates during the last ten days based upon speech – and does so in several ways. None of them are constitutional.

For example, the Act classifies speakers based upon the viewpoint of their messages. Speakers who endorse candidates during the last ten days of a campaign are exempt. Mont. Code Ann. § 13-35-402(2). Speakers who reference candidates during the last ten days of a campaign without endorsing them, however, are required by the Act to give notice to those candidates.

The Act also classifies speakers based upon their status. Candidates and political committees are subject to the Act. Mont. Code Ann. § 13-35-402(1). But other speakers who communicate exactly the same message at exactly the same time and in exactly the same manner are not subject to the Act. These include individuals as well as the press, unions, and corporations that distribute to members, shareholders, or employees campaign advertising that would otherwise be subject to the Act.[4]

Additionally, the Act classifies speakers based upon the method by which they communicate their messages. Those who communicate orally or online are not subject to the Act at all. Those who communicate by print or broadcast media are required to give candidates notice on the day that communications qualifying under the Act are published. Mont. Code Ann. § 13-35-402(3)(a) & (c). The Act's most stringent requirements fall on speakers like Montana Citizens who use the

---

[4] See p. 15, *supra*.

Post Office to transmit their messages. Mont. Code Ann. § 13-35-402(3)(b). These speakers are required to give advance notice to a candidate of their campaign materials.

These classifications "affect[ ] fundamental rights" by imposing differing degrees of regulations upon speakers who engage in core First Amendment speech by communicating opinions about candidates for public office. *Clark*, 486 U.S. at 461. The State cannot show how these classifications achieve a compelling state interest or how they are narrowly tailored. Thus, the Act violates the Fourteenth Amendment's Equal Protection Clause and should be struck down on that basis.

## CONCLUSION

For all of the foregoing reasons, Plaintiff Montana Citizens For Right To Work respectfully requests this Court grant its motion for summary judgment, declare the "Clean Campaign" Act unconstitutional, and enjoin its enforcement.

DATED: September 14, 2021 Respectfully submitted,
/s/ Matthew G. Monforton
Matthew G. Monforton
Monforton Law Offices, PLLC
32 Kelly Court
Bozeman, Montana 59718

Quentin M. Rhoades
Rhoades, Siefert & Erickson, PLLC
430 Ryman Street
Missoula, MT 59802

Attorneys for Plaintiff

# CERTIFICATE OF COMPLIANCE WITH L.R. 7.1(d)(2)(E)

I hereby certify that this document, excluding caption, tables and certificate of compliance, contains 3629 words, as determined by the word processing software used to prepare this document, specifically Microsoft Word 2007.


DATED: September 14, 2021        Respectfully submitted,

<u>/s/ Matthew G. Monforton</u>
Matthew G. Monforton
Attorney for Plaintiff