IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| MONTANA CITIZENS FOR RIGHT TO WORK, a Montana incidental political committee, | CV 21–68–H–DWM |
| Plaintiff, | OPINION and ORDER |
| vs. | |
| JEFFREY MANGAN, in his official capacity as Montana Commissioner of Political Practices, | |
| Defendant. | |

Plaintiff Montana Citizens for Right to Work ("Montana Citizens")
challenges the "Fair Notice" provision of Montana's Clean Campaign Act on both
First Amendment and Equal Protection grounds. (Doc. 1.) The challenged law
requires, *inter alia*, political committees to contemporaneously provide a candidate
with a copy of any campaign advertisement published within ten (10) days of an
election if that advertisement refers to, but does not endorse, the candidate. *See*
Mont. Code Ann. § 13–35–402. The law does not pass constitutional muster.

## BACKGROUND

The underlying facts are largely undisputed. (*See* Doc. 14 at 2.) Montana

Citizens is registered as an incidental political committee. (Doc. 1 at ¶ 20.) Six

days before the November 2020 election, it sent approximately 16,000 mailers to

Montana voters located in 20 different legislative districts. (*Id.* ¶ 22.) The mailers

had three components:

> (1) 2020 candidate surveys with information on where local candidates stood on issues related to organized labor and union dues ("2020 Candidate Survey");
>
> (2) letters elaborating on the candidate survey results and urging voters to express their views on right to work issues to the candidates ("Dear Friend" letter); and
>
> (3) surveys to be returned that indicate whether the voter contacted the local candidates about right to work issues ("Survey Reply Memo").

(Doc. 1-2 at 17–79.) The "mailer would not qualify as a direct endorsement of any

particular candidate/s, and none *directly* call for the election of any candidate/s or

the defeat of other candidate/s." (*Id.* at 9.)[1]

On October 30, 2020, Trent Bolger of the Montana Democratic Party filed a

formal complaint with Defendant Jeffrey Mangan ("Mangan"), Montana's

---

[1] As a point of interest, in a lawsuit regarding a similar statute in Arizona, the plaintiff complied with the law and only then challenged its constitutionality. *See Ariz. Right to Life Pol. Action Comm. v. Bayless*, 320 F.3d 1002, 1007 (9th Cir. 2003). Doing so did not prejudice the plaintiff's standing but rather "demonstrate[d] a commendable respect for the rule of law." *Id.* (quotation marks omitted).

Commissioner of Political Practices, alleging that Montana Citizens violated the

Fair Notice provision under § 13–35–402 when it did not notify the candidates

identified in the mailers as the laws required.  (Doc. 1-1 at 3.)  The statute at issue

provides:

> (1) A candidate or a political committee shall at the time specified in subsection (3) provide to candidates listed in subsection (2) any final copy of campaign advertising in print media, in printed material, or by broadcast media that is intended for public distribution in the 10 days prior to an election day unless:
>
>> (a) identical material was already published or broadcast; or
>>
>> (b) the material does not identify or mention the opposing candidate.
>
> (2) The material must be provided to all other candidates who have filed for the same office and who are individually identified or mentioned in the advertising, except candidates mentioned in the context of endorsements.
>
> (3) Final copies of material described in subsection (1) must be provided to the candidates listed in subsection (2) at the following times:
>
>> (a) at the time the material is published or broadcast or disseminated to the public;
>>
>> (b) if the material is disseminated by direct mail, on the date of the postmark; or
>>
>> (c) if the material is prepared and disseminated by hand, on the day the material is first being made available to the general public.
>
> (4) The copy of the material that must be provided to the candidates listed in subsection (2) must be provided by electronic mail, facsimile

transmission, or hand delivery, with a copy provided by direct mail if the recipient does not have available either electronic mail or facsimile transmission. If the material is for broadcast media, the copy provided must be a written transcript of the broadcast.

§ 13–35–402.

On March 10, 2021, Mangan upheld Bolger's complaint, finding there were sufficient facts to show that Montana Citizens violated the provision by failing to provide the mailer to the candidates as required by law. (Doc. 1-2 at 1–15.) Montana Citizens concedes that it did not provide notice of the mailers to the candidates referenced in them. (Doc. 5 at 2.) On August 18, 2021, Mangan offered to settle the controversy if Montana Citizens agreed to pay a $8,000 fine. (Doc. 1-3, 1–2.) No deal. Instead, Montana Citizens filed a Verified Complaint against Mangan on September 13, 2021, (Doc. 1), followed by a motion for summary judgment on September 17, 2021, (Doc. 4). On October 8, 2021, Mangan filed a motion to dismiss and cross-motion for summary judgment. (Doc. 8.) A hearing where oral argument was heard took place on November 30, 2021. Following that argument, the parties were ordered to file supplemental briefing on *Arizona Right to Life Political Action Committee v. Bayless*, 320 F.3d 1002 (9th Cir. 2003), which was submitted December 6, 2021, (*see* Docs. 19, 20).

## LEGAL STANDARDS

Both parties seek summary judgment on Montana Citizens's First Amendment claim. Montana Citizens's Equal Protection claim, however, is also

4

challenged under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Both standards are provided below.

## I.      Dismissal

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Dismissal under Rule 12(b)(6) is appropriate "where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." *L.A. Lakers, Inc. v. Fed. Ins. Co.*, 869 F.3d 795, 800 (9th Cir. 2017) (internal quotation marks omitted).

## II.     Summary Judgment

A party is entitled to summary judgment if it can demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is warranted where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). Only disputes over facts that might affect the outcome of the lawsuit will preclude entry of summary

judgment; factual disputes that are irrelevant or unnecessary to the outcome are not considered. *Id.* at 248.

ANALYSIS

## I.      Nature of the Challenge

Montana Citizens's Verified Complaint asks that § 13–35–402 be declared unconstitutional both on its face and as applied. (Doc. 1 at 10.)[2] But, as argued by Mangan, neither Montana Citizens's motion nor its supporting brief address an as-applied challenge. At oral argument, counsel for Montana Citizens took the position that while the claim is primarily facial, the alleged "advance notice" requirement created by the statute's "postmark" requirement for mailers is also implicated here. Despite that caveat, the claims are fundamentally facial. *See Young v. Hawaii*, 992 F.3d 765, 779 (9th Cir. 2021) (en banc) ("A facial challenge is a claim that the legislature has violated the Constitution, while an as-applied challenge is a claim directed at the execution of the law.").

## II.     First Amendment

Montana Citizens first argues that the Fair Notice provision violates the First Amendment, insisting that because the statute is a content-based restriction that is

---

[2] Montana Citizens also seeks "[a]n injunction prohibiting the Commissioner from prosecuting Plaintiff Montana Citizens." (Doc. 1 at 11.) Although that is likely to be the practical effect of today's decision, the request for injunctive relief was neither briefed nor argued.

6

not viewpoint neutral it must meet the requirements of strict scrutiny and fails to

do so.  Mangan argues that the lower standard of "exacting" scrutiny is the proper

measure because the provision is merely a disclosure statute, and, under this

standard, the provision is constitutional.  Alternatively, Mangan takes the position

that any offending portion of the statute can be severed to meet the strictures of the

First Amendment.  Montana Citizens has the better argument on both points.

### A.    Level of Scrutiny

The parties' principal disagreement is whether the statute is subject to strict

or exacting scrutiny.  The First Amendment applies to the states through the

Fourteenth Amendment by incorporation, and it forbids the enactment of any law

"abridging the freedom of speech."  U.S. Const. amend. I.  "Political speech lies at

the core of speech protected by the First Amendment, as it is the means by which

citizens disseminate information, debate issues of public importance, and hold

officials to account for their decisions in our democracy."  *Nat'l Ass'n for Gun*

*Rights v. Mangan (NAGR)*, 933 F.3d 1102, 1111 (9th Cir. 2019).  This means

"[t]he right of citizens to inquire, to hear, to speak, and to use information to reach

consensus is a precondition to enlightened self-government and a necessary means

to protect it."  *Citizens United v. FEC*, 558 U.S. 310, 339 (2010).  "The First

Amendment has its fullest and most urgent application to speech uttered during a

campaign for political office."  *Id.* (quotation marks omitted).  Accordingly,

> laws that burden speech are [generally] subject to strict scrutiny—that is, they must be narrowly tailored to further a compelling government interest. But regulations directed only at *disclosure* of political speech are subject to somewhat less rigorous judicial review—exacting scrutiny, which requires the government to show that the challenged laws are substantially related to a sufficiently important governmental interest.

*NAGR*, 933 F.3d at 1112 (internal quotation marks and citations omitted); *see also Doe v. Reed*, 561 U.S. 186, 196 (2010). The Supreme Court recently clarified that even exacting scrutiny requires "that the disclosure requirement be narrowly tailored to the interest it promotes." *Ams. for Prosperity Found'n v. Bonta*, 141 S. Ct. 2373, 2385 (2021).

Disclosure laws are treated differently from other limitations on speech because while they "may burden the ability to speak, . . . they impose no ceiling on campaign-related activities and do not prevent anyone from speaking." *NAGR*, 933 F.3d at 1112 (quotation marks omitted). The Ninth Circuit, for example, emphasized the *positive* impacts disclosure laws may have on political speech: "Far from restricting speech, electioneering disclosure requirements reinforce democratic decisionmaking by ensuring that voters have access to information about the speakers competing for their attention and attempting to win their support." *Id.* Thus, such laws are subjected "to a somewhat less demanding standard than strict scrutiny." *Id.*

Montana's Fair Notice provision operates as a disclosure law. *Compare with Reed*, 561 U.S. at 202 (signers of referendum petitions required to disclose names and addresses); *Human Life of Washington Inc. v. Brumsickle*, 624 F.3d 990, 1005 (9th Cir. 2010) (producers of independent expenditure advertisements within 21 days of an election must the state name of candidate or ballot measure identified and the sponsor's position); *Yamada v. Snipes*, 786 F.3d 1182, 1195 (9th Circ. 2015) (noncandidate committees required to file organizational reports, which reveal the names of officers and its assets on hand); *NAGR*, 933 F.3d at 1107 (Montana's electioneering disclosure statute's application to advertisements that do not state a position but provide information about a candidate's position). Nevertheless, Montana Citizens insists strict scrutiny applies because § 13–35–402 targets negative campaign advertising and is therefore a content-based restriction that is not viewpoint neutral. Its postulate is on the money.

"Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Tschida v. Motl*, 924 F.3d 1297, 1303 (9th Cir. 2019). "A law may also be content based if it requires authorities to examine the contents of a message to see if a violation has occurred." *Id.*; *see also Victory Processing, LLC v. Fox*, 937 F.3d 1218, 1226 (9th Cir. 2019). In this case, § 13–35–402 requires the contemporaneous disclosure of *certain* speech. Specifically, the statute requires

the speaker to provide a copy of the particular campaign advertisement to any candidates individually mentioned therein "except candidates mentioned in the context of endorsements."[3]  § 13–35–402(2).  Because "[t]he law explicitly targets certain speech for regulation based on the topic of that speech . . . [the Court] must apply strict scrutiny."  *Victory Processing, LLC*, 937 F.3d at 1226; *see also Tschida*, 924 F.3d at 1303 (noting that a facially neutral law may be content based if it "is justified by a concern that stems from the direct communicative impact of speech") (internal quotation marks omitted).

Mangan's arguments to the contrary are not convincing.  Mangan first claims the statute "does not restrict, discourage, burden, or limit speech at all." (Doc. 9 at 26.)  But courts have long recognized that compelled disclosure encroaches on speech.  *See Buckley v. Valeo*, 424 U.S. 1, 64, 68 (1976) (per curiam) ("[W]e have repeatedly found that compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment.").

Next, Mangan argues that some "cursory examination" of speech that is incidental to the application of an otherwise content-neutral restriction does not make the restriction content based.  (Doc. 9 at 27; Doc. 16 at 9.)  Mangan is correct

---

[3] The statute does not apply to materials previously published or those that do not mention the opposing candidate.  *See* § 13–35–402(1).  These limitations are not at issue here.

that some content-based inquiries used "to determine whether a rule of law applies to a course of conduct" can still be found content neutral.  *See Hill v. Colorado*, 530 U.S. 703, 721–22 (2000).  However, the Supreme Court has more recently clarified that when a law is content-based on its face, it is subject to strict scrutiny "regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech." *Reed v. Town of Gilbert*, 576 U.S. 155, 165 (2015); *see also Barr v. Am. Ass'n of Political Consultants, Inc.*, 140 S. Ct. 2335, 2347 (2020) (addressing legality of robocalls to collect government debt).  This is so if the law, unlike Montana's Fair Notice provision, "does not discriminate among viewpoints within that subject matter." *Reed*, 576 U.S. at 165.  Under Montana's Fair Notice provision, endorsements are treated differently from non-endorsements specifically because the state as a matter of policy does not believe candidates need to respond to endorsements.  The state therefore "draws a distinction based on the message a speaker conveys." *Id.* at 163.  "That is about as content-based as it gets." *Barr*, 140 S. Ct. at 2346.

Finally, Mangan argues exacting scrutiny should apply here because the Ninth Circuit upheld Montana's electioneering disclosure law under that same standard.  (*Id.* at 28 (referring to *NAGR*).)  But *NAGR* does not address the issue.  Moreover, the language here is different from the "electioneering communication"

statute, which broadly covered material that "does not support or oppose a candidate or ballot issue."  Mont. Code Ann. § 13–1–101(16)(a).

When all is said and done, a statute is presumptively unconstitutional if it "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 155.  Because Montana's Fair Notice provision is content-based, strict scrutiny applies.[4]  *See also Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062, 1068 (9th Cir. 2020).

**B.    Strict Scrutiny**

To survive strict scrutiny, Mangan must show that § 13–35–402 is narrowly tailored to achieve a compelling state interest.  *Victory Processing, LLC*, 937 F.3d at 1226.  The statute does not survive such scrutiny.

Mangan insists that Montana's Fair Notice provision serves three compelling interests: (1) "deterring corruption or the appearance of corruption," (2) "providing the electorate with information," and (3) "protecting candidates' right to respond late in a campaign." (Doc. 9 at 25; Doc. 16 at 6).[5]  They are addressed in turn.

Courts consistently recognize an "important" or "substantial" interest in both providing the electorate with information and combatting corruption.  *See Buckley*,

---

[4] The fact "exacting scrutiny" also requires that the law be "narrowly tailored," *see Bonta*, 141 S. Ct. at 2385, diminishes the import of this conclusion.  As a result, the Fair Notice provision would fail under either standard.

[5] Although Mangan indicates that the Fair Notice provision passed with a "nearly unanimous vote," (Doc. 16 at 4), neither party presents any legislative history.

424 U.S. at 66–68; *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 196 (2003);

*Canyon Ferry Rd. Baptist Church of E. Helena, Inc. v. Unsworth*, 556 F.3d 1021,

1031 (9th Cir. 2009) (collecting cases); *NAGR*, 933 F.3d at 1116 (same); *see also*

*Yamada*, 786 F.3d at 1197.  Less clear, however, is whether these interests ascend

to the level of "compelling."  That question can be avoided, however, as Mangan

fails to adequately connect the law at issue with either interest.  First, Mangan

presents no evidence showing that the disclosure of negative campaign

advertisements to individual candidates combats corruption.  *See Bayless*, 320 F.3d

at 1013 ("Although we do not doubt that the state has an interest in preventing

corruption and the appearance of corruption in its elections, Arizona has failed to

explain how the statute relates to those interests.")  Unlike other disclosure cases

regarding political contributions and expenditures, § 13–35–402 "does not regulate

any financial aspect of a [political action committee]'s participation in the political

process.  Rather, it imposes a more pernicious burden on speech in that it delays,

and sometimes even prevents, political speech on the basis of content." *Id.*  In the

absence of such a connection, § 13–35–402 "cannot pass muster on this basis."

*Id.*; *see also McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 354 (1995)

("Required disclosures about the level of financial support a candidate has received

from various sources are supported by an interest in avoiding the appearance of

corruption that has no application to this case").

In the same way, Mangan fails to connect Montana's Fair Notice provision to an informed electorate. Unlike many disclosure laws, § 13–35–402 does not require disclosure about a particular candidate or entity to the general public. Here, the disclosure at issue is between a candidate or entity and an individual candidate. As a result, the "informational" interest espoused in other disclosure cases is inapposite. In *Yamada*, for example, the Ninth Circuit specifically phrased the relevant interest as "reporting and disclosure obligations provide information *to the electorate about who is speaking*" because "[t]his transparency enables the electorate to make informed decisions and give proper weight to different speaker and message." 786 F.3d at 1197 (emphasis added); *see also NAGR*, 933 F.3d at 1112 (reinforcing electorate interest in having "access to information *about the speakers* competing for their attention and attempting to win their support") (emphasis added). As argued by Montana Citizens, Montana's Fair Notice provision in this case requires disclosure to specific, individual candidates, not disclosure of any information to the electorate as a whole. While the required disclosure may result in the release of additional information into the public sphere, the law itself mandates no such thing. To the contrary, enforcing § 13–35–402 has the potential to "chill" campaign speech in the final days of an election. "A State's claim that it is enhancing the ability of its citizenry to make wise decisions by restricting the flow of information to them must be viewed with some

14

skepticism." *See Eu v. S.F. Cnty. Dem. Centr. Comm.*, 489 U.S. 214, 228 (1989). Thus, to the extent an informational interest may be compelling, it is not achieved here.

That leaves only the State's purported interest in in giving candidates a right to respond to negative campaign advertisements on the eve of an election.  In a perfect political place that notion makes sense.  But last-minute negativity is a reality whether endorsed or not.  Although first characterized as the state's interest in responding to "false" information, Mangan has not shown that last-minute campaign advertisements are more or less likely to contain "false" information than any other advertisement.  Thus, a compelling interest in correcting "false" information, to the extent one exists, is not at issue here.  Nonetheless, Mangan's argument is based almost entirely on the synonymous treatment of false and negative speech.  Mangan relies primarily, if not exclusively, on the Supreme Court's decision in *United States v. Alvarez*, 567 U.S. 709 (2012), to show that the right to respond is a compelling interest.  That reliance on is misplaced.  Although *Alvarez* stated that "[t]he First Amendment itself ensures the right to respond to speech we do not like," *id.* at 727–28, "it is *key* that the regulatory scheme in *Alvarez* dealt entirely, and only, with false speech," *281 Care Comm. v. Arneson*, 766 F.3d 774, 784 (8th Cir. 2014).  And as the Supreme Court explained in *McIntyre*, a case challenging an Ohio law prohibiting anonymous campaign

literature, the state "cannot seek to punish fraud indirectly by indiscriminately outlawing a category of speech, based on its content, with no necessary relationship to the danger sought to be prevented." 514 U.S. at 357. Based on the record in this case, the "right to respond" does not provide a compelling interest justifying the burdens Montana has placed on "negative" campaign speech. *Cf.* *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241 (1974) (holding that a state may not compel a newspaper that prints editorials critical of a particular candidate to provide space for a reply by the candidate). Mangan "has simply decried 'negative campaigning', in general, and while the Court might agree that negative campaigning is distasteful, that is not a sufficient basis for interfering with core first amendment rights." *Shrink Missouri Gov't PAC v. Maupin*, 892 F. Supp. 1246, 1255 (E.D. Mo. 1995).

Moreover, even if the state's identified interest was compelling, (*see* Doc. 14 at 9 (Montana Citizens conceding that "[p]rotecting the First Amendment rights of citizens to respond to political advertising is indeed a compelling interest")), Mangan has not shown the statute is narrowly tailored to achieve that interest. "A statute is narrowly tailored if it targets and eliminates no more than the exact source of the evil it seeks to remedy." *Victory Processing, LLC*, 937 F.3d at 1227. "If a less restrictive alternative would serve the state's compelling interest with the

same level of effectiveness, the state must use that alternative." *Id.* at 1228.  Here, the statute is both overbroad and underinclusive.

As to its overbreadth, Montana's Fair Notice provision requires disclosure in all contexts except endorsements.  As a result, while Mangan's arguments focus on the right to respond to negative advertising, the statute also requires disclosure in the context of neutral advertisements.  For example, if a political action committee issued a mailer that merely outlined the voting records of two candidates on an issue with no further commentary, that mailer would be subject to disclosure.  As such, the law is overbroad.

The law is also underinclusive.  "While narrow tailoring requires that a statute not cover *more speech* that is necessary to serve a compelling government interest, a statute can also fail strict scrutiny if it covers *too little* speech."  *Victory Processing, LLC*, 937 F.3d at 1228.  "Underinclusivity creates a First Amendment concern when the State regulates one aspect of a problem while declining to regulate a different aspect of the problem that affects its stated interest *in a comparable way*."  *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 451 (2015).  Here, the disclosure rule only applies in the last ten days of an election.  While the timing of certain advertising may have unique impacts, *cf. Mills v. State of Ala.*, 384 U.S. 214, 219–20 (1966) (overturning state statute penalizing newspaper editorials published the day of an election and recognizing the danger of "silenc[ing] the

press at a time when it can be most effective"), Mangan fails to provide any

evidence supporting that position, especially related to the ten-day timeframe

statutorily imposed here.  That omission is particularly problematic under Montana

law as absentee ballots are mailed to voters 25 days before an election.  *See* Mont.

Code Ann. § 13–13–205(1)(a)(ii); *see also Bayless*, 320 F.3d at 1012 ("[A]n

increasing number of voters have begun voting in advance of election day.").

The law also does not cover certain types of communication.  Although

Mangan argues oral communication is inherently different from print

communication, he once again provides no evidence to support that position.

Under the current law, disclosure is not required if a candidate or political action

committee went to a town hall meeting and disparaged an opponent, even falsely.

Additionally, Montana Citizens initially argued that the provision was

underinclusive because it also did not apply to the internet or social media.  In

response, Mangan cited regulatory authority outlining the timing requirements for

"broadcast media [and] digital media."  *See* Admin. R. Mont. 44.11.607(2)(b).

While Montana Citizens conceded this point at oral argument, it seems doubtful

that the regulation insulates the statute from an inclusivity problem in light of the

fact that § 13–35–402 only references "broadcast media," which does not include

internet, *see* Admin. R. Mont. 44.11.103(27).

The statute also fails to cover speakers beyond candidates and political action committees.  In *Bayless*, for example, the Ninth Circuit found a similar Arizona statute unconstitutional in part because it only applied to political action committees and not candidates.  *See* 320 F.3d at 1009.  Here, Montana's law is more narrowly tailored than Arizona's because it includes candidates.  But Mangan fails to show that either candidates or political action committees are the primary groups engaged in negative last-minute election advertising.  *See Bayless*, 320 F.3d at 1013–14 ("[N]or does the state's evidence support even an inference that the [political action committees] are a significant source of negative press.").  To be sure, if Mangan presented such evidence, Montana's Fair Notice provision could be "appropriately scaled to the level of political advocacy in which an organization [or candidate] engages." *NAGR*, 933 F.3d at 1115; *see id.* at 1116 ("Organizations that frequently engage in political speech can be required to disclose more information than organizations that only do so occasionally.").  But the record is silent on this point and as it stands, individuals, other organizations, and the press are all "free to place as many negative, misleading or confusing advertisements as they like, none of which are subject to the [] notice requirement." *Bayless*, 320 F.3d at 1013.

It should not require saying, but not all of Montana Citizen's challenges have merit.  For example, Montana Citizens argues the statute is underinclusive

because it does not address endorsements; however, Mangan has shown the disclosure of endorsements does not implicate the same interest in the right to respond context as negative advertising.  While Montana Citizens attempted to present situations where a candidate may benefit from being informed of a last-minute endorsement, that benefit is distinct from the compelling interest in the right to respond identified by the state.  This argument is not dispositive as noted above.

Because Montana's Fair Notice provision is not narrowly tailored to serve compelling state interests, it does not pass constitutional muster.  Mangan argues the law can be saved by severing out the "endorsement" exception.

## C.    Severance

The severability of a statute is matter of state law.  *Sam Francis Found'n v. Christies, Inc.*, 784 F.3d 1320, 1325 (9th Cir. 2015) (en banc).  Under Montana law, a statute may be severed even if it, like here, does not contain a severability clause.  *State v. Theeler*, 385 P.3d 551, 554 (Mont. 2016).  But, in so doing, a court

> must determine whether the unconstitutional provisions are necessary for the integrity of the law or were an inducement for its enactment.  In order to sever an unconstitutional provision, the remainder of the statute must be complete in itself and capable of being executed in accordance with the apparent legislative intent.  That is, if severing the offending provisions will not frustrate the purpose or disrupt the integrity of the law, [a court] will strike only those provisions of the statute that are unconstitutional.  [The Montana Supreme Court] has long held that if an invalid part of the statute is severable from the rest, the portion which

is constitutional may stand while that which is unconstitutional is
stricken out and rejected.

*Id.* (internal quotation marks, alterations, and citations omitted).

Here, Mangan's principal argument is premised on the unique interest a
candidate has in responding to negative campaign advertisements.  At oral
argument, Mangan argued that the statute was not underinclusive because it need
not include endorsements in order to achieve the State's interest.  As a result,
extending the statute to include disclosure related to endorsements would frustrate
the very purpose of the law.  Therefore, Montana's Fair Notice provision cannot be
made constitutional through severance.

## III.   Equal Protection

Montana Citizens also challenges Montana's Fair Notice provision on equal
protection grounds.  "The Equal Protection Clause of the Fourteenth Amendment
commands that no State shall deny any person within its jurisdiction the equal
protection of the laws, which is essentially a direction that all persons similarly
situated should be treated alike."  *City of Cleburne v. Cleburne Living Ctr.*, 473
U.S. 432, 439 (1985) (internal quotation marks omitted).  Mangan seeks to dismiss
this claim because Montana Citizens has not adequately pled that it is similarly
situated with groups that are treated differently under the statute.  (*See* Doc. 9 at
32–33.)  Mangan further argues that even if the allegations in the Verified
Complaint were sufficient, summary judgment is appropriate because the groups

21

Case 6:21-cv-00068-DWM Document 21 Filed 01/18/22 Page 22 of 25

referred to by Montana Citizens are not similarly situated. (*See id.* at 33–34.)

Neither argument has merit.

In this case, the Verified Complaint alleges that two groups are not subject

to the Fair Notice provision: speakers who are not candidates or political

committees, (Doc. 1 at ¶ 58), and mailers that endorse candidates, (*id.* ¶ 59).

Although Mangan questions whether Montana Citizens has presented "similarly

situated" classes, the Verified Complaint contains sufficient facts to assess equal

protection in this context. *See Johnson v. City of Shelby, Miss.*, 135 S. Ct. 346, 346

(2014) (per curiam) (explaining that the federal pleading rules "do not countenance

dismissal of a complaint for imperfect statement of the legal theory supporting the

claim asserted").

Once adequately pled, to prevail on its equal protection claim, Montana

Citizens "must show that a class that is similarly situated has been treated

disparately." *Roy v. Barr*, 960 F.3d 1175, 1181 (9th Cir. 2020) (internal quotation

marks omitted). This is a three-step process. *See id.* "The first step in the equal

protection analysis is to identify the state's classification of groups." *Ariz. Dream

Act Coal. v. Brewer*, 855 F.3d 957, 966 (9th Cir. 2017) (quotation marks omitted).

A court must therefore search for a "comparative group composed of individuals

who are similarly situated to those in the classified group in respects that are

relevant to the [state's] challenged policy." *Roy*, 960 F.3d at 1181 (quotation

marks omitted). "*If* the two groups are similarly situated, [the Court must] determine the appropriate level of scrutiny and then apply it." *Id.* (quotation marks omitted).

At the first step, "[t]he groups must be comprised of similarly situated persons so that the factor motivating the alleged discrimination can be identified." *Brewer*, 855 F.3d at 966. (internal quotation marks omitted). This means that while the groups need not be identical in all respects, "they must be similar in those respects that are relevant to [Montana]'s own interests and its policy." *Id.* As mentioned above, Montana Citizens have identified two sets for comparison: (1) political action committees/candidates versus individuals and (2) endorsing political action committees versus non-endorsing political action committees.

Regarding (1), Mangan persuasively argues that the Ninth Circuit has determined that campaign laws "tailored to reach only those groups with a 'primary' purpose of political activity" may be constitutionally appropriate. *Brumsickle*, 624 F.3d at 1011, 1013; *but see Bayless*, 320 F.3d at 1013 (criticizing similar Arizona statute for "differentiating" between political committees, candidates, and individuals in the First Amendment context). "Organizations that frequently engage in political speech can be required to disclose more information than organizations that do so only occasionally." *NAGR*, 933 F.3d at 1116. Thus, for the purposes of Montana's Fair Notice provision, political committees and

candidates are not "similarly situated" to other individuals.  *See id.* at 1117

(discussing Montana's "two-tiered reporting structure").

Montana Citizens's argument regarding endorsing and non-endorsing

political committees, (2) above, raises a closer question as they represent similarly

situated groups (political committees) that are classified based on their viewpoint

on a candidate and that distinction is fundamental to the stated interest behind the

Fair Notice provision.  As a result, the Court must move on to step two to

determine the appropriate level of scrutiny.  Montana Citizens argues that because

the "right to discuss candidates" is a fundamental right, the Court should apply

heightened, or exacting, scrutiny.  (*See* Doc. 5 at 16.)  Mangan does not address the

appropriate level of scrutiny.  Ultimately, Montana Citizens is correct that the First

Amendment right to free speech is a fundamental right, *Police Dep't of Chi. v.*

*Mosley*, 408 U.S. 92, 101 (1972), and therefore strict scrutiny is appropriate.  *See*

*id.* at 95 ("[A]bove all else, the First Amendment means that government has no

power to restrict expression because of its message, its ideas, its subject matter, or

its content.").  Mangan provides no argument or proof to support a compelling

interest in such viewpoint discrimination.  In the absence of any argument or

evidence as to how a compelling state interest is served in treating political action

committees espousing different messages incongruously, the law violates the Equal

Protection Clause.

CONCLUSION

On this record, the state has failed to show that Montana's Fair Notice provision is narrowly tailored to achieve a compelling state interest. Many would agree that while Montana's desire to promote discourse in response to negative campaign advertisements is laudable, the First Amendment cannot be so easily overcome. "To the contrary, the First Amendment requires that politicians 'tolerate insulting, even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment.'" *Bayless*, 320 F.3d at 1014 (quoting *Boos v. Barry*, 485 U.S. 312, 322 (1988)). Accordingly,

IT IS ORDERED that Montana Citizens' motion for summary judgment (Doc. 4) is GRANTED and Mangan's motion (Doc. 8) is DENIED. Section § 13–35–402 is DECLARED facially unconstitutional and its provisions cannot be severed. The Clerk is directed to enter judgment consistent with this Order and close the case.

DATED this 18th day of January, 2022.

11:29 A.M.

Donald W. Molloy, District Judge
United States District Court